**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORRAINE KASTREVA,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 4:04-1610** |
| **V.** | : | **(McCLURE, D.J.)** |
| | | **(MANNION, M.J.)** |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Social Security Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433.

## I. Procedural Background

By way of background, the plaintiff protectively filed her application for benefits on February 27, 2003, in which she alleged that she had become disabled on June 30, 2001, due to a history of TIAs[1] and coronary artery disease.  (TR. 13).   After her claim was denied initially, (TR. 42-47), the

---

[1]      TIA - Transient Ischemic Attach. MEDical ABBREViations at 354 (12th ed. 2005)

plaintiff's application eventually came on for a hearing before an administrative law judge, ("ALJ"), on February 9, 2004.  At that hearing, the plaintiff was represented by the same counsel that is representing her in this appeal. (TR. 25-41).

On March 25, 2004, the ALJ issued a decision in which he found that the plaintiff met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through June 30, 2001; that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; the plaintiff's history of TIAs, and coronary artery disease were considered "severe" based on the requirements in the Regulations at 20 C.F.R. § 404.1520(c); those medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4.

The ALJ also found that the plaintiff's allegations regarding her limitations were not totally credible for the reasons set forth in the body of the ALJ's decision; that the plaintiff's past relevant work was as a telemarketer and assistant manager; that as of June 30, 2001, the plaintiff had the residual functional capacity for medium work, which did not preclude her from performing her past relevant work as a telemarketer, (20 C.F.R. § 404.1565). As a result, the ALJ concluded that the plaintiff was not under a "disability" as defined in the Social Security Act, at any time relevant. (TR. 17-18).

The plaintiff filed a request for review of the ALJ's decision with the

Appeals Council which was denied on May 21, 2004.  (TR. 5-9). Thus, the ALJ's decision stood as the final decision of the Commissioner. Currently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on July 22, 2004.  (Doc. No. 1).

## II. Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 C.F.R. § 404. 1520.

The instant decision was ultimately decided at the fourth step of the process, when the ALJ determined that based on the medical evidence, testimony at the hearing and the claimant's residual functional capacity, the plaintiff could have returned to her past relevant work as a telemarketer and as an assistant manager.  (TR. 17).

## III.  Evidence of Record

The plaintiff was born on March 29, 1949.  (TR. 54).  She has a high school education.  (TR. 13, 29, 71).  Her past relevant work includes work as

a telemarketer and an assistant manager. (TR. 13, 74).

The plaintiff's medical record is extensive.  The evidence establishes that the plaintiff's serious medical problems began in 1998, when she had a stroke. One of the most recent medical records is a consultative report of Good Shepherd Rehabilitation Hospital Muscular Dystrophy Clinic dated January 12, 2004, which relates the plaintiff's medical history. Having thoroughly reviewed all of the various reports and records in the file, it appears that this report sets forth the plaintiff's medical history and treatment as thoroughly and succinctly as possible, and follows in pertinent part:

> ...[The plaintiff] is a nice 54-year-old, right-handed white female with a past medical history of hypertension, strokes x2 in the left hemisphere with right-sided weakness in 1998 and 2003, multiple TIAs and also hypothyroid and hypercholesterolemia. Her history of present illness dates back to 1998, when she had a stroke with right-sided weakness.  By this time, she had a full work up which revealed a left subclavian stenosis, for which she had an angioplasty. Later on, she had repeat TIAs, for which she was placed on Coumadin and her last TIA dated in 2003.  She had an MRI 6 months ago which revealed an old stroke, other than the stroke she had, which she did not know about.   In September or October of 2003, she started to develop difficulties speaking and swallowing to the extent that she could not speak at all and she had choked with her food.  She was checked by Dr. DiGiovanni with a repeat MRI and angiogram which showed no abnormality.  She was referred to an ENT specialist who did laryngoscopy which revealed a vocal cord cyst which was removed, but it also revealed right vocal cord paralysis.  She received a Medrol pack after the procedure x2, and after that she did improve very much.  She is still maintaining a right-sided weakness for which she sees physical therapy.  She used to work until 1 year ago, when this right-sided weakness came back.  Her current main complaint is generalized tiredness and fatigue and right leg numbness.  She also complains of vertigo when standing up too fast and decreased hearing on the right.   She also complains of decreased sensation on the right side. She has fallen a few times and [walks] with a shuffle and circumduction gait.  Her last MRI was in October of 2003, and did not show any

acute change.  She is also describing her weakness as being worse at nighttime and shortness of breath, more in the evening. After she received the Medrol pack and improved, Dr. Giovanni started to treat her empirically for myasthenia gravis[2] with Mestinon 60 mg, once a day.  He sent for a acetylcholine receptor antibodies which all came back negative.  She did not have an EMG yet...

...On neurological examination, the patient was awake, alert and oriented x3.  Intact memory.  No aphasia.  Followed commands 4/4, recall 3/3.  Cranial nerves show pupils equally round and reactive to light and accommodation.  Extrocular muscles intact.  Visual fields full to confrontation.  There is a right central facial palsy, decreased V3 on the right.  Tongue, uvula and palate were midline.  Sternocleidomastoid was weak on the right .  Both shoulder shrugs were weak.  On motor examination there were bilateral outward drifts, right side spooning and mild right side weakness, distal more than proximal and upper extremities more than the lower extremities.  There were resting tremors which could be postural kinetic tremor or cerebral outflow type.  Sensory showed bilateral glove and stocking to pin prick, temperature and touch as well as questionable right hemisensory deficit.  Deep tendon reflexes were +3 all over, but brisker on the right. Both toes were equivocal.  Coordination showed right side ataxia and dysmetria on finger-to-nose.  Gait showed mild circumduction gait on the right.  Her labs as faxed with the medical record showed negative acetylcholine receptor antibodies.

Our impression at this point shows:

...She had a stroke at a young age when she was 49 which could be due to the subclavian stenosis but other possibilities need to be ruled out, for example, connective tissue disease and

---

[2]Myasthenia gravis: a motor disorder marked by muscular fatigue that develops with repetitive muscle use and improves with rest.  It is caused by antibodies to the acetylcholine receptor in the neuromuscular junction and a decrease in receptor sites for acetylcholine...weakness and fatigue of the eye muscles, muscles of mastication and pharyngeal muscles are the most prominently affected in most patients.  The disease is rare, affecting about 60 persons out of a million. Taber's Cyclopedic Medical Dictionary at 1341 (19th ed.  2001).

vasculitis.  Her repeated TIAs on top of Coumadin may be a red flag that her Coumadin needs to be increased and her INR needs to be adjusted to be between 3 and 3.5 if she has an antiphospholipid antibody syndrome, however we will not pursue this until vasculitis is proved or antiphospholipid antibody syndrome is proved...

(TR. 419-422).  The report went on to discuss various possible diagnoses and forms of treatment.  It was as signed by Terry D. Patterson, M.D.

The court has reviewed the results of the various diagnostic studies done over the years since 1998, and they comport with the findings of Dr. Patterson.  Among the many diagnostic tests are the following: Report of Patrick Kerrigan, D.O., dated September 28, 1999, regarding recent hospital admission for painful left lower extremity (TR. 99);  Endocrinology consultation report of Herbert Fellerman, M.D., regarding question of recurrent transient ischemic attacks of the right face. The plan was to rule out  a clotting disorder, but otherwise to continue on her present regime of medications (TR. 292); CT scan of head which was read as normal (TR. 293); MRI of head dated March 20, 2003, which was read as normal (TR. 294); MRI of the brain dated March 20, 2003, demonstrated nonspecific hyperintensive lesions of the left corona radiata, with small vessel ischemic changes (TR. 295); report of cerebral vascular examination, essentially normal with less than 20% stenosis of the proximal ICAs[3] bilaterally (TR. 260); Mercy Health Partners Northeast Region hospital discharge summary dated January 28, 2003, patient thought to have had a small stroke and was discharged with medications and for follow-up

_____

[3]    ICA - Internal Carotid Artery. MEDical ABBREViations at182 (12th ed. 2005)

with Dr. DiGiovanni (TR. 252-253); discharge summary Wyoming Valley Health Care System dated June 22, 2002, patient treated for weakness and headache; an EEG was read as normal, a CT scan was read as normal, an MRI showed no acute pathology and was unchanged from priors MRIs. She was discharged to home on medications in stable and improved condition (TR. 239-241);  Chest X-ray dated December 17, 2001, read as normal (TR. 234); EMG for numbness of hands dated April 13, 2001, read as normal, however, with reduced response amplitude suggesting mild degree of median neuropathy or early carpal tunnel syndrome (TR.198); MRI of the lower right knee dated March 2, 2001, read as mild osteoarthritic changes (TR. 199); results Thallium stress test dated 12/18/01, "probably negative adenosine myocardial perfusion study." (TR. 219); MRI of the lumbar spine dated June 23, 2003, showing mild disc dessication at the lower three lumbar discs with a mild L4-5 disc herniation without significant defect (TR. 415), and results of a carotid doppler study dated March 23, 2003, read as minimal atherosclerotic changes of the carotids bilaterally (TR. 313).

The plaintiff also has treated for narrow angle glaucoma, which was reported by her treating eye specialist, Dr. Elena R. Farrell, as being under control after surgery, and with medication. (TR. 373, 388).  A non-examining, non-treating Agency physician concluded on April 25, 2003, that the plaintiff's prognosis regarding the glaucoma was "good" and that her combined impairments, including the glaucoma, did not prevent her from frequently lifting up to 25 pounds, or from standing/sitting/walking up to 6 hours in an 8-

hour work day. (TR. 407-414).

The plaintiff's treating physician Denise Klynowsky, M.D. completed a Residual Functional Capacity evaluation on April 23, 2003. (TR. 303-309). She indicated at that time that the plaintiff was capable of frequently lifting up to 25 pounds; standing or walking up to 4 hours; with no limitation sitting/pushing/pulling, although the plaintiff should avoid work requiring balancing or climbing.

The plaintiff testified at the hearing which was held on February 9, 2004. She stated that she worked last as a telemarketer, and that she stopped working in July 2001, because she was laid off.  She stated that she usually worked 4 to 5 hours per day. (TR. 30-31).  She stated also that she had worked for NOT ONLY WINDOWS as a marketing representative, and worked trade shows up to 10 to 12 hours per day. (TR. 32). She stated that she stopped working because the company  went out of business.  She expressed her opinion that she was, at the time of the hearing, unable to work due to fatigue, inability to concentrate, and that she was still prone to having TIAs which left her debilitated for days afterwards.  As to her ability to work on or about June 30, 2001, she stated she had been hospitalized a few times, but that she had returned to work, in a matter of a few days, after each hospitalization. (TR. 33).

The plaintiff stated further that a few weeks prior to the hearing she had been evaluated by a physician in Allentown, upon referral by her treating neurologist Dr. DiGiovanni.  She believed that she had been diagnosed with

8

myasthenia gravis[4], and that this had been the "link that's been missing right along..." (TR. 34). She stated that her sleep patterns are disturbed; that she fatigues easily, and has trouble lifting anything that weighs more than a few pounds.  She believes that she has had a series of 14 to 16 mini strokes from which she would routinely recover within a few days. (TR. 35). She reported that because of her medical condition,  her husband does many of the routine household chores which she did in the past, but that she does make supper four times a week. (TR. 38).  Most days she reads and watches TV because she has no strength and because she never knows when another mini-stroke will affect the muscles in her face.  She said that when she has these attacks, she cannot eat and her throat becomes paralyzed. (TR. 38).

A vocational expert was available to testify at the hearing, but she did not do so.  The ALJ concluded that the plaintiff's testimony had established that as of June 30, 2001, the date she was last insured for Social Security Disability purposes, the only reason the plaintiff stopped working was because she was laid off, and not for any reason related to her disability.  The ALJ noted that while the evidence most likely demonstrated that the plaintiff's medical problems had significantly worsened over time, there was nothing in the medical record to suggest that she had any impairment, or combination of impairments as of June 30, 2001, which were so severe as to preclude her

---

[4]     Myasthenic gravis - A motor disorder marked by muscular fatigue that develops with repetitive muscle use and improves with rest. Taber's Cyclopedic Medical Dictionary at 1341 (19th ed. 2001

from performing her past relevant work as a telemarketer. (TR. 17-18).

## IV.  Discussion

The plaintiff argues that the Commissioner committed two errors at the administrative level.  The plaintiff maintains that the ALJ: (1) erred in failing to have a medical advisor available to testify at the hearing, and (2) erred in concluding that the plaintiff had the residual functional capacity to return to her past relevant work.  Specifically, the plaintiff claims that the ALJ failed to consider all of her impairments in combination, and that he overlooked her diagnosis of myasthenia gravis.  She maintains that the ALJ's decision is not supported by substantial evidence, and that a more balanced review of the record must compel the conclusion that she was disabled from any kind of gainful activity as of June 30, 2001.  She requests that this court reverse the ALJ's decision and remand to the Commissioner for further development of the record. (Doc. No. 15, p. 9).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite her impairments, the plaintiff retained the residual functional capacity to return to her prior relevant work as a telemarketer, thus dictating a finding of "not disabled" as defined by the Act. (Doc. No. 12).  The respondents further argue that the plaintiff's last date insured was June 30, 2001, and that the diagnosis of myasthenia gravis, coming in January 2004, is therefore irrelevant to the question of whether she has been disabled within the meaning of the Social Security Disability Act as

10

of the date she was last insured.

After carefully reviewing the record, we conclude that the ALJ's findings are supported by substantial evidence of record. Thus, the decision should not be disturbed on appeal. The controlling fact in this matter is that the plaintiff's insured status expired as of June 30, 2001. Thus, it is the plaintiff's burden to show that she was disabled within the meaning of the Social Disability Act on or before that date. 20 C.F.R. § 404.131(a); Matullo v. Bowen, 926 F.2d 240, 244, (3rd Cir. 1990). The plaintiff makes much in her brief in support of her appeal of her recent diagnosis of myasthenia gravis. (*See, generally*, Doc. No. 15). The suspected diagnosis of myasthenia gravis did not happen until January 2004, at the earliest. In addition, as the record presently exists, there is no confirmed diagnosis of myasthenia gravia, although clinical testing was suggestive of it.

Even if there were a confirmed diagnosis of myasthenia gravia, however, that diagnosis in and of itself does not establish disability. A particular diagnosis by a treating doctor does not automatically entitle a claimant to social security disability benefits. Whatever the diagnosis, the claimant must still provide sufficient evidence that she has met the Act's statutory definition of disability. Petition of Sullivan, 904 F.2d 826 (3d Cir. 1990).

Significantly, the plaintiff's own medical evidence does not establish that she had an impairment, or combination of impairments, which prevented her from performing all work as of June 30, 2001. It is true that the objective

11

medical evidence on or before June 30, 2001, showed that the plaintiff was treated for transient ischemic attacks. But those attacks never resulted in an inability to return to work. The plaintiff continued to work for several years, despite the TIA diagnosis. Furthermore, the plaintiff's own testimony demonstrates that she did not stop working at any time near June 2001, because of a medical impairment. She testified that she stopped working in 2001 because her work was no longer available, and not because of any medical impairment.

Not one of the plaintiff's treating physicians opined that she was unable to work. One of the plaintiff's treating physicians, Dr. Klynowsky completed a Residual Functional Capacity evaluation form on April 23, 2003, which plainly indicated that the plaintiff was capable of sedentary to medium work. (TR. 303-309). In fact, the lack of medical evidence of total disability on or about June 30, 2001, is notable. Absent such evidence, the plaintiff cannot establish disability under the Social Security Act.

As to the plaintiff's complaint that the ALJ erred in failing to have a medical advisor present at the hearing, the record demonstrates that there was no need to have a medical advisor present. 20 C.F.R. § 416.917 relates to consultative examinations and states:

416.917 Consultative examination at our expense.

If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests. We will pay for these examinations. However, we will not pay for any medical examination arranged by you or your representative without our

advance approval. If we arrange for the examination or test, we will give you reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it. We will also give the examiner any necessary background information about your condition.

20 C.F.R. § 416.917 (emphasis added). While it is true that an ALJ has a duty to develop a full and fair record in social security disability cases, <u>Ventura v. Shalala</u>, 55 F.3d 900, 902 (3d Cir. 1995), this duty can be accomplished "either by remanding the case for further development, by seeking medical assistance, or perhaps by soliciting testimony from the claimant. <u>Id.</u> The duty to develop the record, however, does not require a consultative examination unless the claimant first establishes that such an examination is necessary to enable an ALJ to make the disability decision. <u>Thompson v. Halter</u>, 2002 WL 2004569, at *3 (3d Cir. June 3, 2002)(citing 20 C.F.R.§ 416.917 and <u>Turner v. Califano</u>, 563 F.2d 669, 671 (5th Cir. 1977)).

The ALJ stated regarding the plaintiff's alleged disability as of June 30, 2001:

The undersigned Administrative Law Judge finds the testimony of the claimant not fully credible as of June 30, 2001, the date last insured, concerning the severity of the symptoms and the extent of the limitations. The record shows that the claimant had multiple TIAs beginning in 1998, but was able to return to work...Diagnostic test were negative for cerebrovascular accident...No physician expressed an opinion that the claimant was disabled on or before June 30, 2001. Even after the claimant's stroke in 1993, Dr. Klynowsky expressed the opinion that the claimant was capable of less than a full range of medium work and that the claimant testified that she would have continued working part time if she was not laid off. The undersigned suspects that her condition has worsened since her stroke in 2003 but there is no evidence to support total disability as of June 30, 2001 when she is last insured.

13

(TR. 17).  The plaintiff testified at the hearing that in early 2001 she had been working for Not Only Windows, doing marketing shows at malls.  She stated that although she did not work every day, on the days that she did work she would routinely work between 10 to 12 hours.  She stated further that the reason she stopped working for Not Only Windows was because the company went bankrupt.  When the ALJ asked her if she could have continued with the work if the company had not gone out of business the plaintiff responded, "Not at the present time, sir, no." (TR. 33).  The ALJ clarified that his question was not whether she thought that she was capable of doing the Not Only Windows job at the present time, but rather when she stopped in 2001.  The plaintiff went on to explain that in 2001 she had had to be hospitalized as a result of the TIAs, but that within a few days she would return to work. (Id.)

The plaintiff bears the burden to show that her impairments prevented her from doing all work for a period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Petition of Sullivan, 904 F.2d at 845. There are situations wherein the lack of medical evidence is actually strong evidence of non-disability, and this appears to be one of those cases. *See* Dumas v. Schweiker, 712 F.2d 1545, 1553 (3d Cir. 1983)(holding that the Commissioner is entitled to rely not only what is said in the record, but also on what it does not say)(emphasis added).

In summary, although it is clear that the plaintiff presently may have a severe medical problem, we are constrained by the record before us to conclude that the ALJ had substantial information from which to conclude that

14

the plaintiff did not have an impairment, or combination of impairments, so severe as to preclude work as a telemarketer <u>as of June 30, 2001</u>.


## V.  Recommendation.

On the basis of the foregoing, **IT IS RECOMMENDED THAT** the plaintiff's appeal of the decision of the Commissioner of Social Security, be **DENIED**.


<u>s/ Malachy E. Mannion</u>
MALACHY E. MANNION
United States Magistrate Judge


Dated:   June 22, 2005

O:\shared\REPORTS\2004 Reports\04-1610.wpd

15